UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN J. PACHELLA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ARIVO ACCEPTANCE, LLC, GARFF ENTERPRISES INC. AND ROBERT AVERY, Jointly and Severally,<br><br>　　　　Defendants. | ECF CASE<br><br>No.: _____<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Stephen J. Pachella hereby alleges through his attorneys, Lipsky Lowe LLP, as against Defendants Arivo Acceptance, LLC, Garff Enterprises Inc. and Robert Avery as follows:

### NATURE OF THE ACTION

1. Pachella asserts against Defendants Arivo Acceptance, LLC, Garff Enterprises Inc., and Robert Avery claims of retaliation under the New York Labor Law and slander *per se* under New York common law.

### JURISDICTION & VENUE

2. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1): Pachella is a citizen of the State of New York; Arivo Acceptance, LLC and Garff Enterprises Inc. are citizens of the State of Utah; and the matter in controversy exceeds $75,000, exclusive of interests and costs.

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) as a substantial part of the events giving rise to this claim occurred in this District.

### THE PARTIES

4. Pachella is an adult individual, residing in the State of New York.

5. Upon information and belief, Arivo Acceptance, LLC is a foreign limited liability corporation that is organized and existing under the laws of the State of Utah with its principal place of business located in Utah at 4770 S. 5600 W Ste, West Valley City, UT 84118.

6. Upon information and belief, Garff Enterprises Inc. is a foreign corporation that is organized and existing under the laws of the State of Utah with its principal place of business located in Utah at 111 E. Broadway, Salt Lake City, UT 84111.

7. Robert Avery, Chief Executive Officer of Arivo, is a resident of the State of Utah.

## STATEMENT OF FACTS

Background

8. Arivo is primarily a subprime indirect auto lender that also houses a small direct refinance auto lending business.

9. Garff Enterprises, Inc., through multiple subsidiaries and affiliates, retails and sells new and used automobiles, offers auto warranty and insurance products, sells auto parts and accessories, owns commercial truck and modification businesses, and offers other products and services. Garff Enterprises operates throughout the United States.

10. John Garff, President and CEO of Garff Enterprises, is Chairman of the Board of Arivo.

11. Garff Enterprises is the primary equity contributor to Arivo, having contributed the majority of the approximately $70 million of equity, either directly or through affiliates and includes Arivo's financial results in its financial statements.

12. Pachella is a resident of the State of New York since January 2001 when he moved to this State; shortly after he moved here, Pachella registered to vote in the State of New York; since 2011, Pachella has maintained his principle residence in Westchester County; he has lived in and paid property taxes at the same Westchester house since 2012; Pachella has two children who attend public school in the Westchester County town in which he resides; Pachella has a valid New York driver's license listing his Westchester address; and he lists his New York residence on his federal tax returns[1].

13. On April 1, 2018, Robert Avery, Chief Executive Officer of Arivo, contracted with Pachella to be a consultant Chief Financial Officer for Arivo and paid him under an IRS Form 1099.

14. On October 1, 2018, Avery hired Pachella to be Arivo's, first ever, CFO.

15. Garff, in his capacity with Garff Enterprises and Arivo, was involved in hiring Pachella, decided Pachella's compensation package agreement and is the signatory to that agreement.

16. When Defendants hired Pachella, they knew he lives in the State of New York and maintains his principal place of residence in New York.

17. When working as a consultant to Arivo, Pachella worked the majority of the time in New York.

18. When Avery hired Pachella as its CFO and Pachella switched to a full-time employee, he worked every other week, Monday through Thursday, in Utah, working the other weeks in New York.

---

[1] In referencing the tax returns, Pachella is not conceding they are relevant beyond establishing the address he lists on them.

19. From March 2020 to March 2021, Pachella worked exclusively from his Pelham, New York home.

Garff Enterprises

20. Garff Enterprises manages and implements the Human Resources, health plan and payroll for Arivo employees.

21. When Pachella was hired, he attended an orientation with other Garff Enterprises employees at the Audi Lehi dealership in Lehi, Utah.

22. Arivo's Controller, Andrew Hall, reports to the Chief Financial Officer for Garff Enterprises, Inc., Jim Campbell.

23. Paula Ross, a Garff Enterprises employee, told Pachella that upon his hiring that the Defendants needed to tax him in the State of Utah because neither Arivo nor Garff Enterprises is registered to do business in the State of New York.

24. Garff Enterprises and Arivo are an integrated enterprise, disregarding corporate formalities and routinely sharing employees and resources.

25. After Defendants fired him, Pachella received his COBRA package, in which he was advised that National Benefit Services, LLC is the COBRA administrator, which was retained by Ken Garff, who provided him health insurance coverage.

Pachella as Arivo's Chief Financial Officer

26. Pachella's duties as CFO included determining and solving for Arivo's capital needs, developing and managing Arivo's capital funding programs, overseeing Arivo's internal and external financial reporting and quantitative analysis, leading the Arivo securitization program, leading relationships with investment banking partners, rating agencies, and portfolio investors, serving as point of contact for Arivo's asset-backed

security program, building and managing staffing needed to disseminate appropriate and approved information concerning Arivo's capital markets program, and evaluating and advising Arivo and its Board of Directors on long-range and short-range financial and strategic plans, capital requirements, and regulatory matters.

27.     Pachella was highly successful in his CFO role: he was instrumental in growing Arivo's EBITDA from -$4.0 million in 2018 to $13+ million a year by 2021; he led Arivo's efforts to secure more than $1.6 billion of debt and equity funding through multiple credit facilities that enabled Arivo to expand; he engaged over 35 outside investors to raise almost $800 million of secured debt through ABS 144A securitizations; and he served as capital markets advisor to Garff Enterprises during its purchase of Vidgo, an American streaming television service, for which Pachella served as CFO until August of 2021. During this time, Pachella reported directly to John Garff concerning Vidgo matters.

28.     Defendants routinely recognized Pachella's successes: in October of 2018 Garff and the Board congratulated Pachella on securing a warehouse line of credit with Cantor Fitzgerald and paid him a substantial success fee for that work; in October of 2019 Pachella was again recognized by Garff and the Board for securing a JPMorgan Chase warehouse line of credit; also in October of 2019 Pachella was recognized for his success in closing Arivo's first ever securitization, Arivo 2019-1 despite the company having minimal historical performance; Pachella was recognized again for the closings of securitizations Arivo 2021-1, 2022-1, and 2022-1 as well as for securing a forward purchase agreement with Marathon Asset Management; around August 2021, John Garff (Chairman of Arivo's Board of Directors) told Pachella that he was "the right guy for the [CFO] job"; in September 2022, Avery (Arivo's CEO) told Pachella that he was doing a

"spectacular job in capital markets" as CFO; in October of 2022 Arivo's Board of Directors applauded Pachella for securing a second warehouse line of credit provider in CapitalOne, and on November 2, 2022 Arivo's Board of Directors applauded Pachella's CFO performance following the close of its largest securitization ever.

29. After an August 2021 discussion, Garff reiterated to Pachella that he thought Pachella was the right person for the job.

Retaliation

30. Arivo has four Rule 144A (formally 17 C.F.R. § 230.144A) bond issuances in the market,[2] for which Arivo has filed seven Form ABS 15G[3]s and Pachella has signed them with the statement "Pursuant to the requirements of the Securities Exchange Act of 1934, the reporting entity has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

31. On November 16, 2022 and while he was at his New York residence, Pachella participated in a video meeting with Avery (CEO), Andrew Hall (Arivo's Controller), Mike Gustafson (Arivo's Vice President of Finance & Capital Markets) and Landon Starr (Arivo's Chief Risk Officer) and raised alarms concerning Arivo's deteriorating portfolio performance and insufficient loss reserve rates (i.e., the amount of capital Arivo needs in reserve to sufficiently cover for expected future credit losses following loan defaults in its portfolio).

---

[2] A 144A bond offering is a private placement offered in the United States for U.S. investors.

[3] Form ABS-15G is used for reports of information required under Rule 15Ga-1 and Rule 15Ga-2 of the Exchange Act of 1934. Exchange Act Rule 15Ga-1 requires asset-backed securities to provide disclosure regarding fulfilled and unfulfilled repurchase requests with respect to asset-backed securities.

32. Arivo is required to, and does, report its actual and anticipated loss rates on its financial statements that are provided to its auditors for approval, which are then provided to Arivo's investors, potential investors and the Internal Revenue Service.

33. During the November 16, 2022 meeting, Pachella, reported that Arivo had begun experiencing loss rates closer to 7.5% to 8.0%, equaling almost an $11 million change in its expected credit loss rates. Analysis for this meeting was prepared by Pachella, Andrew Hall, and Mike Gustafson together and was agreed to by all before the meeting.

34. Before the November 16, 2022 meeting, Arivo had been reserving for a 6.0% loss rate and reporting that rate to its auditors and investors.

35. Pachella reported the loss rates during the November 16, 2022 meeting because he reasonably believed Arivo was (i) inaccurately reporting its loss reserves on its financial statements and, by doing so, Arivo was making the company appear considerably more profitable than it was to its auditors, investors and potential investors (ii) in not changing those loss reserves would be violating securities and tax laws and (iii) needed to increase the loss reserve.

36. During the November 16, 2022 meeting and in response to Pachella's complaint about Arivo misreporting its loss reserve rate, Avery dismissed Pachella's complaint, inquiring whether "we'd go to GAAP [Generally Accepted Accounting Principles] prison" for doing so. In response to Avery's statement, Pachella and Hall explained that Pachella and Avery have a fiduciary duty to accurately report Arivo's credit losses; that they could be subject to criminal penalties for failing to do so. Avery dismissed Pachella's complaints, saying the auditors do not understand Arivo's business, that

Pachella should present loss curves which were outdated and irrelevant, and that CECL[4] is a "bogus piece of crap."

37. During the November 16, 2022 call, Pachella said to Avery that "people go to jail for this [i.e., misrepresenting financial statements]" and that "I am not willing to risk that."

38. During the November 16, 2022 call, in response to Avery's questions about what would happen if Arivo kept reporting the loss reserve rate at 6.0%, Pachella stated that "Rob [Avery] and I would go to jail."

39. During the November 16, 2022 meeting, in response to Avery's suggestion that Pachella present outdated and irrelevant loss curves to the auditors, Pachella told Avery that he believes in doing so that Arivo would be violating Section 17(a) of the Securities Act of 1933 and Securities and Exchange Commission ("SEC") Rule 10b-5 by inaccurately reporting its loss reserve rate, which could result in a one-year prison sentence. To which, Avery responded, "Who is the GAAP police?" Pachella, in response to that, stated that Avery was asking him to make misrepresentations on financial statements and that he was unwilling to do so.

40. Pachella also stated, during the November 16, 2022 meeting, that Arivo needs to produce its audited financial statements to JPMorgan, CapitalOne and its investors in its SEC-registered 144a bond securities and any misrepresentations in those statements

---

[4] Current Expected Credit Losses ("CECL") introduces the concept of PCD financial assets, which replaces PCI assets under existing U.S. GAAP. For PCD assets, the new accounting standard requires institutions to estimate and record an allowance for credit losses for these assets at the time of purchase. https://www.federalreserve.gov/supervisionreg/topics/faq-new-accounting-standards-on-financial-instruments-credit-losses.htm

would breach Arivo's representations and warranties in its Sale and Servicing Agreements and that, in turn, could result in numerous penalties, including from the SEC.

41. Defendants did not want to change its loss reserve rate for at least three reasons: 1) if Arivo were to accurately report its loss reserves, it would have to reserve more capital for those loans which would result in reduced Arivo profits; 2) if it accurately reported its loss reserves, investors would see that Arivo was at greater risk of losses thus eroding investor confidence; 3) and if losses were deemed higher by creditors JPMorgan Chase and CapitalOne, and by the rating agencies for its securitizations, Arivo would most likely have to post more first loss "haircut" capital in its warehouse lines of credit and securitizations, thus requiring more cash from the business and ultimately Garff.

42. Defendants were aware that Pachella was in New York for the November 16, 2022 meeting.

43. The November 16, 2022 meeting ended with no agreement on what to do on the loss reserves but only that they would reconvene and decide what to do.

44. The November 16, 2022 meeting is the first Loss Reserve Committee Meeting in which no decision was made to either confirm or change the loss reserve.

45. Following the November 16, 2022 meeting, Pachella spoke with Hall and Gustafson and reiterated the need for Arivo to accurately report its loss reserves, regardless of it making others unhappy, as it is necessary to protect the company and comply with securities laws.

46. Before the November 16, 2022 meeting, Pachella and Avery spoke almost daily.

47. After the November 16, 2022 meeting, Avery stopped speaking with Pachella.

48. Before the November 16, 2022 meeting, Pachella and Avery met multiple times per day when Pachella was in Utah.

49. After the November 16, 2022 meeting, Avery refused to meet with Pachella one-on-one when Pachella was in Utah.

50. Before the November 16, 2022 meeting, Pachella and Avery had 5-6 meetings per week via Zoom when Pachella was in New York.

51. After the November 16, 2022 meeting, Avery declined each of Pachella's requests to meet, cancelled meetings they had already scheduled, and did not participate in any Zoom meetings with him.

52. Before the November 16, 2022 meeting, Pachella attended every financial planning meeting and presented financial information to the Board of Directors.

53. After the November 16, 2022 meeting, Pachella was excluded from multiple financial planning meetings.

54. Before the November 16, 2022 meeting, when Pachella was in Utah, Avery and Pachella would almost always exchange pleasantries when they saw each other.

55. After the November 16, 2022 meeting, when Pachella was in Utah, Avery would not even acknowledge seeing Pachella.

56. Every Monday, Defendants have a meeting to discuss their refinance product.

57. Before the November 16, 2022 meeting, Pachella and Avery always participated in the refinance meeting, absent some extraordinary circumstance.

-10-

58. Following the November 16, 2022 meeting, Pachella participated in every refinance product meeting but Avery did not.

59. On December 8, 2022, Pachella called Garff to discuss Arivo's and Pachella's fiduciary duties to accurately report the loss rates and Avery's objection to accurately reporting the loss rates on its financial statements. During that call, Garff said that Pachella should have been included in a December 9 financial planning meeting with Arivo's Board of Directors despite Avery excluding him from it. Pachella was unaware of the December 9 financial planning meeting until Mike Gustafson alerted Pachella of the meeting on the evening of December 8 saying he was "uncomfortable" that Pachella was not included.

60. On the December 8, 2022 call with Pachella, Garff expressed concern regarding Arivo's losses, the loss reserve meeting of November 16, the fact that he had not been made aware of these issues, and advised that he would instruct Brad Eichers, another Arivo Board member, to reach out to Avery via email regarding these issues prior to the December 9 meeting so that those items could be addressed.

61. Garff did not participate in the November 16, 2022 meeting, nor did any other Arivo Board Member except Avery.

62. Eichers emailed Avery regarding the matters discussed during December call between Pachella and Garff and copied Pachella on the email.

63. In telling Pachella that he should have been asked to attend the December 9 meeting and having Eichers copy Pachella on the follow up email, it demonstrates that Garff was not aware that Avery had decided to terminate Pachella's employment following

the November 16 meeting nor was Garff aware of any plans to terminate Pachella at that time.

  64. On December 9, 2022, Pachella emailed Garff:

> Rob became agitated at the number and our results and was critical of CECL and how it doesn't have "any benefit" for us. Andrew and I tried to explain the [sic] regardless of that fact, CECL is the law and we need to report to our auditors a "fair and reasonable estimate" of our cumulative net lifetime losses and that given the analysis, we should be at least in the mid 7% to mid 8% range for our auditors to sign off. Rob and Landon pushed back stating that we had put in place several loss mitigation factors that will improve performance going forward. Andrew and I were careful to explain that the loss reserve analysis is a purely quantitative objective measurement of loans currently outstanding and that future plans have no bearing on the result.
>
> Rob asked a series of questions including "what if we're wrong, what's the penalty?" "Do we go to GAAP jail?" to which Andrew answered that he and I sign off on the information given to BDO and that misrepresentation could lead to financial penalties and restatements. I also explained that JPMorgan, CapitalOne, and investors in our securitizations require our annual audited financial statements which includes our loss reserve. Any misrepresentation in these is a breach of rep and warranties in the legal documents for which the worst penalties are shut down of the facilities and all cash is trapped and used to turbo the notes until paid in full. This essentially shuts Arivo down as we'd no longer have access to warehouse capital and the residuals in the securitizations would be used to pay down bond holders. We'd be locked out for at least a couple years and most likely servicing would be moved to the backup servicer. Additionally, because our securitizations are 144A cusip'd deals and registered with the SEC, Rob and I could be prosecuted by the SEC and potentially even face jail time. I stated clearly that is something I'm not willing to risk.
>
> Rob then went down the path that we could "argue all day long" with the auditors since they don't know our business and that we could just show them page 4 of the attached presentation which could give us a case to argue for a 6% lifetime CNL. Andrew and I explained that the curves represented need to be weighted based on what is currently outstanding, not curves which have run off, and the trajectory of the risk 3.0 loans clearly show an 8%.
> .. .
> Andrew, Mike, and I immediately had a follow up call to discuss. Andrew started with something to the effect that jail is a pretty low bar for us to consider when determining loss reserves. I let them know that our job is to

present fair and objective information to both the Board and our auditors and that's what we're going to do. Mike later said that Rob was visibly angry after that meeting (I was remote that day). He and I have had little direct conversation since.

65. After sending the December 9 email, between December 9 and 13, Pachella did not hear from anyone regarding the concerns he had raised with Garff nor did he have any contact with Avery or any of the Arivo Board Members.

66. On December 14, 2022 and while Pachella was at his New York residence, Avery called Pachella and fired him.

67. When firing him, Avery told Pachella "I've decided I can't work with you anymore so we're terminating your employment as of today."

68. When he fired him, Avery knew Pachella was in New York.

69. Avery told Arivo employees, banking partners, and investors that Pachella resigned.

70. Several facts show that, prior to the November 16, 2022 meeting, Defendants foresaw that they would be employing Pachella after that November 16, 2022 meeting, including:

    a. Around October 2022, Defendants scheduled Pachella to speak on their behalf at the January 25, 2023, Private Placement Industry Form in Miami, Florida.

    b. In October 2022, Defendants scheduled a December 6, 2022 meeting between Pachella and their relationship manager at JPMorgan, Brian Statfeld.

    c. Pachella was scheduled to present at the upcoming Arivo Board meeting on December 15 and, while working from his New York residence on December 14, was on the phone with Gustafson preparing materials for the Board meeting when Avery called to fire him.

    d.  Pachella participated in the Monday, December 12, 2022 refinance product meeting.

    e.  Between December 12 and 14, 2022, Pachella participated in several virtual meetings with other Arivo executives and colleagues while at his New York home.

  71.  Had Pachella not complained about them violating the law, Defendants would have continued to employ him beyond December 14, 2022.

<u>Further Retaliation and Slander</u>

  72.  On December 22, 2022, Pachella, through his former counsel, emailed a letter to William W. Fife (Arivo's Chief Compliance Officer and General Counsel) and Michael Creer (Ken Garff Enterprises' General Counsel) in which Pachella asserts, *inter alia*, Defendants violated the Labor Law by firing him because of his complaints on Defendants' need to accurately report their loss rates, as doing otherwise violated a law, rule and regulation ("December 22 Email").

  73.  On January 24, 2023, Pachella, through his current counsel, emailed Fife (Arivo's Chief Compliance Officer and General Counsel) a draft complaint in which Pachella asserts Defendants violated the Labor Law by firing him because of his complaints on Defendants' need to accurately report their loss rates, as doing otherwise violated a law, rule and regulation ("January 24 Email").

  74.  Since the December 22 Email, Avery has been telling Arivo management that Pachella was fired because he took an illegal kickback on a 2018 transaction with Cantor Fitzgerald.

  75.  Around late December 2022, a Senior Manager at Arivo told Sal Cano, former Executive Vice President of Sales at Arivo who Pachella fired earlier in 2022 at

Avery's direction, that Avery is telling Arivo employees that Pachella was fired because he took an illegal kickback on a 2018 transaction with Cantor Fitzgerald.

76. On January 27, 2023, Cano told Pachella what the Arivo Senior Manager told him on what Avery is saying on why Pachella was fired.

77. Pachella did not take a kickback on the 2018 transaction with Cantor Fitzgerald.

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK'S
### WHISTLEBLOWER LAW
(Against all Defendants)

78. Pachella realleges every allegation of the preceding paragraphs as if fully set forth herein.

79. Defendants were "employers" within the meaning of N.Y. Lab. Law §§ 190, 196-d, 615(5), 652 and supporting New York State Department of Labor Regulations and employed Pachella.

80. Defendants constitute an integrated enterprise.

81. Pachella complained about Defendants' need to accurately report their loss rates, as doing otherwise he reasonably believed violated a law, rule or regulation, constituting protected activity under the Labor Law.

82. Defendants terminated Pachella for his complaints about the company misreporting its loss rates, violating N.Y. Lab. § 740.

83. No legitimate, non-retaliatory reasons exist for the adverse action Defendants took against Pachella.

84. Pachella's December 22 and January 24 Emails constitute protected activity under the Labor Law.

85. Defendants retaliated against Pachella because of his December 22 and January 24 Emails by intentionally harming his professional reputation.

86. Defendants' actions against Pachella were willful, malicious and wanton.

87. Defendants are liable to Pachella for his loss of wages, liquidated damages, punitive damages, and attorneys' fees and expenses.

## SECOND CAUSE OF ACTION
### SLANDER *PER SE*
(Against all Defendants)

88. Pachella realleges every allegation of the preceding paragraphs as if fully set forth herein.

89. Avery's statement to Arivo employees that Pachella took an illegal kickback on a 2018 transaction with Cantor Fitzgerald is false.

90. Avery's false statement is the type of false statement that tends to injure Pachella in his trade, business and profession and accuse him of a crime.

91. Avery made this false statement without privilege and without authorization by a third party.

92. Pachella, as a consequence of this unlawful act, has been injured in his good name and reputation has suffered pain and mental anguish.

PRAYER FOR RELIEF

WHEREFORE, Pachella respectfully requests that this Court grant the following relief:

1. Accepts jurisdiction over this matter.

2. Impanels and charges a jury with respect to the causes of action.

3. Awards Pachella the following damages against Defendants:

   a. Back pay, front pay, and all benefits along with pre and post judgment interest;

   b. An award of punitive damages;

   c. An award for liquidated damages, prejudgment and post-judgment interest;

   d. Attorneys' fees, costs and expenses to the fullest extent permitted by law; and

   e. Any other relief that this Court deems just and equitable.

DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Pachella demands a trial by jury on all questions of fact the Complaint raises.

Dated: New York, New York
       February 8, 2023

LIPSKY LOWE LLP

s/ Douglas B. Lipsky
Douglas B. Lipsky
420 Lexington Avenue, Suite 1830
New York, New York 10017-6705
212.444.1030
doug@lipskylowe.com
*Attorneys for Plaintiff Pachella*